## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

      Plaintiff,

    vs.                              Cr. No. 06-499 MCA

**TIMOTHY JAMES KENNELLEY,**

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion to Suppress* [Doc. 25], filed November 1, 2006.  The Court held a hearing on the motion on November 27, 2006.  Having considered the parties' submissions, the relevant law, the arguments of counsel, and otherwise being fully advised in the premises, the Court denies the motion.

## I.   FINDINGS OF FACT

1.   Kent O'Donnell has been a police officer with the City of Farmington and County of San Juan in the State of New Mexico for seven years.

2.   On December 29, 2004, Officer O'Donnell was assigned to the street crimes unit of the City of Farmington Police Department.

3.   The street crimes unit is a "proactive" unit that specifically goes out looking for street-level drug dealers, repeat offenders, and gang members.

4.     As a member of the street crimes unit, Officer O'Donnell's responsibilities included, among other things, dealing with gang crimes and gang activities and doing hotel and drug interdiction.

5.     Hotel and drug interdiction involves specifically targeting hotels and motels for the investigation of drug activity.

6.     On December 29, 2004, Officer O'Donnell was on duty with his partner, Officer Mike Briseno.

7.     Officer Briseno has been employed by the City of Farmington Police Department for five years.

8.     Officers O'Donnell and Briseno normally worked the 5:30 p.m. to 3:30 a.m. shift, and were doing so on December 29, 2004.

9.     In the early morning hours of December 29, 2004, Officers O'Donnell and Briseno were patrolling the Rim Rock Lodge Motel, an overnight and extended-stay motel, on Bloomfield Road in Farmington.

10.     Officer O'Donnell described the Rim Rock Lodge Motel as "high crime," and testified that numerous felony and drug arrests have been made there.

11.     At approximately 1:15 a.m. on December 29, 2004, Officer O'Donnell was randomly "running" license plates of vehicles left in the parking lot of the Rim Rock Lodge Motel.

12.     It was within Officer O'Donnell's normal course of conduct to run license plates of

vehicles in parking lots of various motels.

13.     Officers O'Donnell and Briseno testified that license-plate checks can lead to information on serious offenses, such as stolen cars. Officer O'Donnell additionally testified that such checks can also reveal both in-state and out-of-state felony warrants.

14.     Officer O'Donnell ran the license plate of a Ford Probe that was parked directly in front of Room 150.

15.     The Probe's license plate came back stolen.

16.     The officers could have verified from their patrol car whether the vehicle also was stolen, but they chose not to do so. Officer Briseno explained that he and Officer O'Donnell were seeking information not on the vehicle but, rather, on the person associated with the vehicle.

17.     Officer Briseno testified that a check of the Probe itself would have required the officers to stand with their flashlights in front of the vehicle while they copied the VIN, which could have alerted someone inside the motel that an investigation was being conducted outside.

18.     So as not to be seen by the motel's occupants, Officers O'Donnell and Briseno contacted the motel office clerk in an attempt to ascertain the identity of the guest in Room 150.

19.     Officers O'Donnell and Briseno learned that Defendant Timothy James Kennelley

was the registered occupant of Room 150.

20.    It is undisputed that on December 29, 2004, Room 150 of the Rim Rock Lodge Motel

was Defendant's temporary home.

21.    Officer O'Donnell checked for outstanding warrants on Defendant but did not find

any.

22.    At 1:17 a.m., Officers O'Donnell and Briseno knocked on the door of Room 150.

23.    It is undisputed that Officers O'Donnell and Briseno did not knock incessantly.

24.    When they knocked on the door of Room 150, Officers O'Donnell and Briseno were

dressed similarly in their standard police uniforms.  The officers' uniforms consisted

of navy blue, short sleeved shirts with embroidered badges; pants; and shoes or boots.

Their pants were not tucked into their shoes or boots.

25.    Officer O'Donnell was armed with a .45 caliber handgun.

26.    Officer Briseno was armed with a Glock 357.

27.    Officers O'Donnell and Briseno both wore handcuffs and a flashlight on their belts,

but neither one carried a baton or a nightstick.

28.    Neither Officer O'Donnell nor Officer Briseno carried a taser or stun gun.

29.    The officers' patrol unit, a four-door, gold-colored Crown Victoria, was parked in the

parking lot.  While the unit had emergency lights in the windshield and rear deck, it

was not equipped with a light bar.  Officer O'Donnell testified that the unit's

headlights were not on when they knocked on the door of Room 150.

4

30.    Officer Briseno testified that he noticed the lights were on in Room 150 before the officers knocked on the door.

31.    Defendant opened the door and Officer O'Donnell identified himself and Officer Briseno as Farmington police officers and asked if they could come in to speak with Defendant.

32.    At the time Defendant opened the door to his room, neither Officer O'Donnell nor Officer Briseno had drawn his weapon; their firearms were holstered.

33.    When he opened the door, Defendant was dressed only in sweatpants; he was not wearing a shirt or shoes.

34.    Officer O'Donnell described the temperature at the time as "chilly."

35.    Neither Officer O'Donnell nor Officer Briseno told Defendant that he could deny them entry into the room or refuse to speak with them.

36.    Officer Briseno testified that Defendant allowed the officers to enter his room. According to Officer Briseno, when the officers asked to enter his room, Defendant "[t]ook a step wide and said sure or something to that effect."

37.    Officer Briseno also testified that it was the officers' intention to try to enter Defendant's room.

38.    Officers O'Donnell and Briseno entered Room 150 and closed the door behind them.

39.    As the lead officer on the case, Officer O'Donnell was the one who spoke to Defendant.   Officer Briseno did not speak to Defendant.   Officer Briseno did,

however, look around the room while remaining next to Officer O'Donnell.

40.    Officer Briseno credibly testified that his role was to "watch[ his] partner's back and ma[ke] sure nobody else came out of the other rooms [they] could not see."

41.    Neither officer advised Defendant of his <u>Miranda</u>[1] rights at this time.

42.    Because Defendant was not wearing a shirt, Officer O'Donnell immediately noticed tattoos on Defendant's body.

43.    Based on his training at the police academy and his experience as a gang investigator, Officer O'Donnell recognized Defendant's tattoos as prison tattoos, having identified the ink, the style of the tattoos, the prison bars, and what the tattoos said as being consistent with tattoos worn by those who had served time in prison.

44.    After Officers O'Donnell and Briseno entered Defendant's room, Officer O'Donnell asked whether Defendant had any vehicles at the motel, and Defendant responded that the Ford Probe and the car next to it belonged to him.

45.    Officer O'Donnell then asked to see Defendant's license and registration.

46.    As Defendant was looking around the room for his license and registration, Officer O'Donnell asked where Defendant had had his tattoos done and "if he had done time."

47.    As of this time, Defendant still had not been advised of his <u>Miranda</u> rights.

48.    Defendant told Officer O'Donnell that he had spent time in San Quentin State Prison.

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

49.     Because there came a point when Officer O'Donnell could not see where Defendant

was reaching, Officer O'Donnell asked Defendant to stop searching for his license

and registration and to come toward Officer O'Donnell.  Officer O'Donnell testified

that Defendant then "appeared very nervous" and that his answers to such questions

as how long he had been staying at the motel and whether anyone was staying with

him  "were inconsistent."

50.     Officer O'Donnell explained that members of the "normal public" he speaks with at

1:17 a.m. are usually direct and straightforward, but that Defendant "was different

from the regular public that [he] deal[t] with."

51.     Officer Briseno described Defendant as "almost frantically going around the room

looking for the registration[] and driver's license."

52.     At this point, Officer O'Donnell asked Defendant if there were any weapons in the

room.

53.     Defendant responded that there was a handgun in the nightstand next to the bed.

54.     Officer O'Donnell then asked if Officer Briseno could secure the weapon, which was

loaded, and Defendant responded affirmatively.

55.     Officer Briseno secured the gun and Officer O'Donnell asked Defendant if he could

continue to search the room to make sure nobody was hiding in it.

56.     Defendant agreed to allow Officer O'Donnell to continue his search.

57.     When Officer O'Donnell walked into the bathroom, he observed on a counter

needles, rings, and packets with white powder that he believed, based on his training

and experience, to be consistent with items associated with methamphetamine use.

58. Officer O'Donnell then placed Defendant under arrest, handcuffed him, and read him

his <u>Miranda</u> rights.

59. Officer O'Donnell again asked Defendant if he could continue his search and

Defendant said yes.

60. As a result of the search, the officers recovered scales and "miscellaneous items like

that."

61. During his contact with Defendant, Officer O'Donnell maintained a conversational

tone and never raised his voice.

62. Officer Briseno described the conversation between Officer O'Donnell and

Defendant as "[v]ery relaxed, normal."

63. During his contact with Defendant, Officer O'Donnell made no promises, threats, or

inducements.

64. Officers O'Donnell and Briseno kept their weapons holstered during their encounter

with Defendant.

65. Defendant was cooperative throughout the encounter with the officers and did not

restrict their area of search.

66. While Officers O'Donnell and Briseno were still in Defendant's room, two other

officers assigned to the street crimes unit arrived on the scene.

67.   Officer Dave Griego was dressed identically to Officers O'Donnell and Briseno, but Sergeant Ron Anderson was wearing sergeant stripes on his sleeves, as well as a metal badge and name tag.  Although Officer Griego and Sergeant Anderson were armed, they did not display their weapons.

68.   Officers O'Donnell and Briseno transported Defendant to the Farmington police station, where he was interviewed by San Juan County Deputy Sheriff Jacob Schmidt.

69.   Deputy Schmidt has been employed by the San Juan County sheriff's department for six years.

70.   On December 29, 2004, Deputy Schmidt was assigned to the Region II Narcotics Task Force.

71.   Deputy Schmidt advised Defendant of his <u>Miranda</u> rights, which Defendant waived. [Exh. 1].

72.   Defendant then told Deputy Schmidt that just prior to the arrival of Officers O'Donnell and Briseno, he had shot up methamphetamine because he was staying up late.

73.   Defendant told Deputy Schmidt that Officers O'Donnell and Briseno knocked on his door and asked to enter his room, and that Defendant allowed them to do so.

74.   During his interview with Deputy Schmidt, Defendant never indicated that Officers O'Donnell and Briseno (1) threatened, coerced, or forced their way into Defendant's

9

room; (2) entered without Defendant's consent; or (3) brandished their weapons.

75.     On March 8, 2006, Defendant was charged with being a felon in possession of a

firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

## II.     LEGAL ANALYSIS AND CONCLUSIONS OF LAW

On November 1, 2006, Defendant filed a motion to suppress evidence obtained as a

result of what he contends was an illegal detention and search of Room 150 of the Rim Rock

Lodge Motel on December 29, 2004.   [See Doc. 25 at 1].   Defendant argues that to the

extent he consented to the entry of his room by Officers O'Donnell and Briseno, such

consent was involuntarily given because it came as the result of coercive circumstances.

Defendant also submits that he did not voluntarily consent to the search of his room.

Consequently, maintains Defendant, any evidence obtained as a result of the entry and

search must be suppressed as fruits of the poisonous tree.   [See generally id.].   Defendant

additionally argues that Officer O'Donnell's questioning Defendant as to his tattoos and

criminal history amounted to an act of custodial interrogation, prior to which Officer

O'Donnell was required to have advised Defendant of his Miranda rights.   Because

Defendant's non-Mirandized statements ultimately led to the recovery of physical evidence,

Defendant asks that that evidence be suppressed.[2]

───────────────

[2]  I have taken note of the following:
    (1) The findings of the Honorable Leroy Hansen in a *Memorandum Opinion and Order*
[Exh. B], filed in the case of United States v. Pringle, No. CR-00-1242 LH, that portions of
Officer Briseno's testimony given in that case were not credible;
    (2) The findings of the Honorable George A. Harrison in *Findings of Fact and
Conclusions of Law* [Exh. A], filed in the case of State of New Mexico v. Ashcroft, No. CR-99-

## A.    The Officers' Entry Into and Search of Room 150

"'The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects.  The prohibition does not apply, however, to situations in which voluntary consent has been obtained . . . .'"  United States v. Abdenbi, 361 F.3d 1282, 1287-88 (10th Cir. 2004) (*quoting* Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).  The question of whether consent has been given voluntarily is one of fact to be determined from all the circumstances.  United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006) (automobile search).  "The central question is whether 'a reasonable person would believe he was free to leave or disregard the officer[s'] request.'"

_____

989-6, that Officer Briseno's testimony at the suppression hearing that he had obtained consent from the defendant to search her person was not credible;

(3) A jury award of $500.00 in compensatory damages against certain defendants, including Officer Briseno, for violations of Fourth and Fourteenth Amendment rights, including unlawful entry, search, seizure, and arrest, in the case of Mitchell v. Briseno, et.al, No. CIV-03-00061 RLP/LCS. [Exh. C].  Exhibit C consists of a *Memorandum Opinion and Order* dealing with the plaintiff's motions for attorneys' fees and expenses.  Exhibit C is silent as to any facts related to the basis for the underlying claim and, as a result, I cannot place the matter in sufficient context such that it could weigh in favor of Defendant in assessing Officer Briseno's credibility in the present case.

However, I have serious concerns that the testimony of a witness in the present case, Mike Briseno, was not found to be credible or believable in several prior cases.  Above all else, a witness's credibility is essential to our administration of justice and in this case is essential to a criminal defendant's right to a fair and impartial proceeding.

However, there lacks a sufficient evidentiary foundation and nexus between the facts and circumstances of the present case and the facts and circumstances in the two prior cases sufficient to invite the Court to conclude that, simply because Officer Briseno was found not credible in the prior cases, his testimony must necessarily be rejected in the present case.

Accordingly, I decline to give Exhibits A, B, and C any weight.

Id. (*quoting* United States v. Manjarrez, 348 F.3d 881, 885-86 (10th Cir.2003)).  The test is one of objectiveness, and neither the personal traits of the defendant nor his subjective intentions are relevant.  Abdenbi, 361 F.3d at 1293.  The burden of proving valid consent is on the government, which must first present clear and positive testimony that consent was unequivocal and specific and freely and intelligently given and, second, show that the police did not coerce the defendant into granting his consent.  United States v. Pena, 143 F.3d 1363, 1366 (10th Cir. 1998).

The Tenth Circuit has identified a number of factors that suggest an encounter *was not* consensual, including:

(1) the threatening presence of several officers;

(2) the brandishing of weapons;

(3) some physical touching by the officers;

(4) the use of aggressive language or tone of voice indicating that compliance with the officers' request is compulsory;

(5) a request to accompany the officers to the police station;

(6) the prolonged retention of a person's personal effects, such as identification;

(7) the absence of other members of the public; and

(8) the officers' failure to advise the defendant that he is free to leave.

Ledesma, 447 F.3d at 1314; see also Abdenbi, 361 F.3d at 1291 (6:15 a.m. encounter between federal agents and apartment co-tenant in apartment bedroom and living room).

The Tenth Circuit has also identified factors that suggest an encounter *was* consensual, including:

> (1) the officers' pleasant or courteous manner and a tone of voice that is not insisting;

> (2) a public location, such as the shoulder of an interstate highway;

> (3) the prompt return of the defendant's identification and papers; and

> (4) the decision by the officers not to draw their weapons.

Ledesma, 447 F.3d at 1314; see also United States v. Cruz-Mendez, 467 F.3d 1260, 1265 (10th Cir. 2006) (specifically determining that presence of multiple officers and request for identification and proof of legal status do not necessarily render involuntary consent to enter apartment). None of the above factors is dispositive, however, as the district court must consider all the circumstances surrounding the encounter to determine whether consent was voluntary. Ledesma, 447 F.3d at 1314.

I have applied the above-listed factors to the facts of the instant case and am persuaded that Defendant unequivocally, specifically, freely and intelligently, and without coercion consented to Officer O'Donnell's and Officer Briseno's entry into and search of his room. First, the credible suppression-hearing evidence established that there was nothing particularly threatening or intimidating about the officers' presence. The undisputed testimony revealed that Officers O'Donnell and Briseno were dressed in their standard police uniforms, *i.e*, short sleeved, navy blue shirts with embroidered badges; pants; and shoes or boots. The officers wore their pants outside their shoes or boots; they did not tuck

their pants in commando-style.  The officers each carried handcuffs and a flashlight on their belts, but neither was carrying a taser or stun gun.  While the officers were armed, they never brandished or even unholstered their weapons.  Contrary to Defendant's assertion that "an impressive display of police power" in the form of police cars with lights trained in his direction was evident outside Room 150, [see Doc. 25 at 1], the undisputed suppression-hearing testimony showed that one patrol unit, which was equipped with emergency lights in the windshield and rear deck but no light bar, was parked without even its headlights on.  Although two more street-crime unit officers eventually arrived on the scene, they were dressed similarly, if not identically, to Officers O'Donnell and Briseno and also did not display their weapons.

Nor did the credible evidence establish that the officers ever physically touched Defendant (at least not before placing him under arrest and handcuffing him) or spoke to him aggressively.  To the contrary, the undisputed testimony revealed that Officer O'Donnell spoke to Defendant in a conversational, relaxed, and normal tone.  There has been no allegation that, prior to having placed him under arrest, Officers O'Donnell and Briseno asked Defendant to accompany them to the police station, or that they retained any of his personal effects for a prolonged period of time.

While some of the above-listed factors *do* weigh in Defendant's favor, I find those factors to be insufficient, considering the totality of the circumstances, to render Defendant's consent involuntary.  One factor weighing in Defendant's favor is that the encounter

14

between him and the officers occurred in a non-public location.  However, "it is axiomatic that all requests to search a home or apartment are made in nonpublic places."  Abdenbi, 361 F.3d at 1288.  Additionally, while it is undisputed that the officers did not inform Defendant that he was not required to cooperate with their requests, "[t]here is no per se rule requiring such an advisement."  United States v. Little, 18 F.3d 1499, 1505 (10th Cir. 1994).

One of the more compelling factors in the totality-of-the-circumstances analysis is that the encounter between Defendant and Officers O'Donnell and Briseno took place at 1:17 a.m.  Yet I find that the import of this factor is somewhat weakened, inasmuch as the evidence supports the finding that Defendant was nevertheless awake when the officers knocked on his door.  Deputy Schmidt credibly testified that Defendant told him that Defendant had injected methamphetamine just prior to the officers' arrival because he was planning to stay up late.  Officer Briseno credibly testified that before he and Officer O'Donnell knocked on Defendant's door, Officer Briseno noticed that the lights were on in the room.  Thus, while I do find hour of day to be a persuasive factor in the analysis, I nonetheless conclude that any coercive effect of the early-morning contact is somewhat tempered by the fact that Defendant was actually awake when Officers O'Donnell and Briseno knocked on his door.  Compare Abdenbi, 361 F.3d at 1286 (voluntary consent where, among other things, federal agents entered defendant's bedroom at 6:15 a.m. and, though unclear whether defendant was actually asleep, testimony revealed that defendant was in bed, lights were off, and bedroom was "mostly dark") and Harless v. Turner, 456

F.2d 1337, 1338-39 (10th Cir. 1972) (consent not voluntary where several police officers entered defendant's home at 1:45 a.m., "routed" defendant and his wife out of bed, and directed wife to leave room while they questioned defendant about an alleged rape).[3]

**B.    Whether Officer O'Donnell's Questioning of Defendant Constituted a Custodial Interrogation, Prior to Which Defendant Should Have Been Advised of his *Miranda* Rights**

Defendant contends that when Officer O'Donnell began questioning him about his tattoos and criminal history, Defendant, who was not free to leave, was effectively in custody.  Thus, Defendant should have been—but was not—advised of his rights under Miranda.  Consequently, argues Defendant, any statements or evidence obtained from that custodial interrogation must be suppressed.

"'It is well established that police officers are not required to administer Miranda warnings to everyone whom they question.'"  United States v. Rogers, 391 F.3d 1165, 1169 (10th Cir. 2004) (*quoting* United States v. Erving L., 147 F.3d 1240, 1246 (10th Cir.1998)).

---

[3]  The Court also has considered United States v. Jerez, 108 F.3d 684 (7th Cir. 1997), which Defendant cites in support of his argument that time of encounter is a significant factor in assessing the totality of the circumstances.  Again, while the Court does not disagree that time of encounter is an important consideration, the Court finds the facts of Jerez to be distinguishable from the facts of the instant case. In Jerez, it was approximately 11:00 p.m. when two deputy sheriffs began knocking on the defendants' motel room door.  When, after having knocked for a period of three minutes, the deputies realized that they were being "voluntarily" ignored, one of them walked to the side of the motel and began knocking loudly on the window.  That deputy then shined his flashlight into the room and onto the face of one of the defendants, who lay in bed.  Although the deputies eventually were allowed into defendants' room, the Seventh Circuit held that "[t]he deputies' persistence, in the face of the refusal to admit, transformed what began as an attempt to engage in a consensual encounter into an investigatory stop" triggering Fourth Amendment protections, and further commented that "[s]imply stated, this is a case in which the law enforcement officers refused to take 'no' for an answer."  Jerez, 108 F.3d at 687-692.

Rather Miranda's protections apply only when an individual is subject to "custodial interrogation." Miranda v. Arizona, 384 U.S. 436, 439 (1966). An individual "is not 'in custody' for Miranda purposes unless his 'freedom of action is curtailed to a degree associated with formal arrest.'" Rogers, 391 F.3d at 1169 (*quoting* Berkemer v. McCarty, 468 U.S. 420, 440 (1984). Moreover, the "in custody" determination is based on how a reasonable person would understand the situation. Berkemer, 468 U.S. at 442. "This reasonable person 'does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer.'" Rogers, 391 F.3d at 1169 (*quoting* Erving L., 147 F.3d at 1247).

Defendant argues that

> [i]f law enforcement had not coerced [him] into allowing them to enter his residence, they would not have inquired about the presence of weapons . . . , had they not asked about the weapon under such coercive circumstances, he never would have directed them to his bedside table where a handgun was secured out of reach, had they not gone to the bedside table to get the gun they never would have seen the drugs and paraphernalia in the bathroom.

[Doc. 25 at 10]. However, applying a totality-of-the-circumstances analysis, see Rogers, 391 F.3d at 1170, I conclude that a reasonable person in Defendant's situation would not have believed he was under arrest at the time Officer O'Donnell began asking questions.

As for the fact that the questioning occurred in Defendant's home, the Tenth Circuit has specifically held that "'courts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as the

suspect's home." <u>United States v. Ritchie</u>, 35 F.3d 1477, 1485 (10th Cir. 1994) (emphasis in original) (*quoting* 1 W. LaFave, Criminal Procedure § 6.6(e), at 496 (1984 & 1991 Supp.)); <u>Rogers</u>, 391 F.3d at 1170.  Moreover, as explained above, the credible suppression-hearing evidence established that, among other things, (1) Defendant voluntarily consented to the officers' entry into his room; (2) the encounter between the officers and Defendant was relaxed and nonthreatening; and (3) the officers never brandished their weapons.  <u>See</u>, <u>e.g.</u>, <u>Ritchie</u>, 35 F.3d at 1485 (lack of force or threat of force weighed against conclusion that defendant was in custody); <u>Erving L.</u>, 147 F.3d at 1248 (courteous and nonthreatening nature of police actions weighed against conclusion that defendant was in custody).  To the extent that Defendant argues that the presence of uniformed police officers is inherently coercive, I reject his position, given that the Tenth Circuit has held that such a "broad proposition . . . would have the practical effect of preventing all district courts in this circuit from ever finding that an individual's cooperation with law enforcement officials was voluntary."  <u>Abdenbi</u>, 361 F.3d at 1288 (rejecting argument that almost all encounters with law enforcement officers carry an "air of menace" and implicit coercion and, therefore,  no reasonable person ever feels free to decline a request for permission to enter or search).  I conclude that Defendant was not in custody when Officer O'Donnell began asking him questions, and that Defendant voluntarily offered responses to those questions.  Accordingly, I deny Defendant's request to suppress statements obtained as a result of Officer

O'Donnell's questioning.[4]

## III.   CONCLUSION

For the reasons stated above, I conclude that Defendant's encounter with law enforcement officers at the Rim Rock Lodge Motel on December 29, 2004 was consensual in all respects.  I further conclude that Defendant freely and voluntarily conversed with the officers and freely and voluntarily responded to questions posed during that encounter. Accordingly, Defendant's motion to suppress will be denied.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion to Suppress* [Doc. 25] is **DENIED**.

**SO ORDERED** this 28th day of December, 2006, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

---

[4]  Even if the Court had found that Defendant was in custody when Officer O'Donnell began questioning him about his tattoos and criminal history and therefore that statements Defendant made in response to that questioning were given in violation of <u>Miranda</u>, physical evidence obtained as a result would not be excludible, since the Self-Incrimination Clause, which <u>Miranda</u> warnings seek to protect, "cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements."  <u>United States v. Patane</u>, 542 U.S. 630, 637 (2004) (holding that firearm found as result of unwarned but voluntary statement was not excludible under "fruit of the poisonous tree" doctrine).